# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| TENNESSEE EDUCATION LOTTERY CORPORATION, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | No. 3:08-1058 |
| SMARTPLAY INTERNATIONAL, INC., and GAMING LABORATORIES INTERNATIONAL, INC., ) ) ) ) ) | Judge Campbell |
| Defendants. ) | |

## MEMORANDUM

Pending before the Court is Defendant Gaming Laboratories International, Inc.'s ("GLI's") Motion for Summary Judgment (Docket No. 32). Also pending is Defendant Smartplay International Inc.'s ("Smartplay's") Motion for Summary Judgment on its Counterclaim (Docket No. 37). The Motions have been fully briefed by the parties. (Docket Nos. 33, 38, 43, 44, 45, 46 & 48).

For the reasons described herein, GLI's "Motion for Summary Judgment" (Docket No. 32) is granted with respect to Plaintiff's negligence claim, but denied with respect to Plaintiff's breach of contract and misrepresentation claims. Smartplay's Motion for Summary Judgment on Its Counterclaim (Docket No. 37) is granted as to liability, but not damages, and the Court will not enter a final judgment on the Counterclaim until resolution at trial of the amount of Smartplay's damages and TELC's claim for the recoupment or set-off of damages.

1

# I.  FACTUAL BACKGROUND[1]

This litigation arose after a programming error precluded repeating numbers from being drawn in Tennessee's Cash 3 and Cash 4 automated lottery games.

In late 2006 or early 2007, the Tennessee Education Lottery Corporation ("TELC") decided to change its Cash 3, Cash 4, Lotto 5, and anticipated Raffle games from mechanical ball to automated computer drawings.  Towards that end, in April 2007, TELC requested bid proposals for a Random Number Drawing Selection Process and Communications System.  TELC accepted Smartplay's bid and contracted with it to manufacture and install a digital draw system known as the Origin System for $227,988.00.

When Smartplay made its proposal, it indicated that GLI had certified its systems for use by other state lotteries.  On May 9, 2007, James Renegar ("Renegar"), the Contract Manager for TELC, called Christopher Kanis ("Kanis"), a Senior Mathematician at GLI, about testing Smartplay's Origin System.

After talking with Reneger, Kanis sent an e-mail to two of his fellow mathematicians at GLI and to John Grau, a Senior Director of Engineering at GLI.  In relevant part, the email states:

> Jim Renegar of Tennessee Lottery just called. They want us to test the updated Origin System from Smartplay for a Cash 3, Cash 4, Lotto 5 and Raffle game.
>
> - Cash 3 (a pick 3 game) 0-9 with replacement
> - Cash 4 (a pick 4 game) 0-9 with replacement
> - Lotto 5 (a pick 5 game) 1-39 without replacement
> - Raffle – Range and Prizes yet to be determined by lottery.
>
> . . . I then explained how we test for randomness and correlation between FINAL game outcomes and I have not heard of any competitor who goes further than a raw

---

[1]Because Defendants move for summary judgment, the relevant facts must be construed in Plaintiff's favor.

number or an algorithm test.

I said that most lotteries use us because we keep in mind the best interest of the lotteries in that we make sure that the player is getting (and they see) a random final outcome that is in no way correlated to other outcomes.

(Docket No. 42-20, capitalization in original).

Kanis followed up his conversation with Renegar with a letter dated May 21, 2007 which set forth "all requirements" that GLI "tests a Random Number Generator (RNG) against." (Renegar Depo. Ex. 19). Kanis indicated that the "General RNG Requirements" include:

> • The RNG data collected or provided for the evaluation must pass all RNG tests performed.
> • The RNG must produce random, unpredictable and independent draws so that future draws cannot be predicted from any previous draw's outcome.
> • Check for any back doors or logic errors.

(Id.).

On May 29, 2007, GLI sent TELC a 30-page "Response to the Tennessee Education Lottery Request for Random Number Generator Testing and Certification." After noting that TELC "has requested information on testing and certification of the [RNG] provided by Smartplay International for the Lottery's Cash 3, Cash 4, Lotto 5 and Raffle games," (Docket No. 35-5, Ex. 20 at 1), the first twenty-four pages of GLI's proposal were based on a template it had used in the past and generally described GLI and its experience with other state lotteries.

Section 3 of the proposal, entitled "Proposed Solutions," was geared towards the Tennessee Lottery and was intended to "detail the specific tests, reviews and deliverables GLI will provide to the TELC." (Docket No. 35-5, Ex. 20 at 25). Several of the provisions in this section are relevant to the present dispute.

The proposal indicates that GLI's testing would be done in two parts, both of which would

3

"require a submission from Smartplay." Section 3 of the proposal stated:

> We understand that for the initial submission Smartplay International will provide to GLI the source code, two Origin Digital Draw Systems, an executable on each system that can be used to generate the sample data and a list of game rules and configurations for the following games:
> - Cash 3 (a pick 3 game) 0-9 with replacement
> - Cash 4 (a pick 4 game) 0-9 with replacement
> - Lotto 5 (a pick 5 game) 1-39 without replacement)

(Id.). The next section of the proposal notes "[t]he key concern with traditional lotteries is the testing of a Random Number Generator," and the purpose of testing the RNG is to ensure that

> - The draw device is capable of generating number or rules that are appropriate for each of the defined games available.
> - The method of generating these numbers or values is unbiased and unpredictable.
> - The random number generator program has safeguards in place to restrict operations to only authorized users.
> - Verification that there is no internal code that can affect the overall randomness of the application is just as important as verification that the initial numbers selected are random.

(Id. at 25-26).

> The next sub-section titled "Source Code and Design Documentation Review" provides:
>
> GLI will analyze all code [sic] it is given for theoretical randomness, that is, for routines that by definition cause the algorithm to take into account previous play. Additionally, we will review all design documentation to ensure that the overall game concept and design implementation will not adversely affect overall randomness. We will also verify that the software is capable of producing all numbers within the desired range and that all numbers are evenly weighed. Any additional security elements that may be incorporated into the code will also be reviewed to ensure that they do not influence the overall randomness of the application.

(Id. at 26). Finally, Section 3.2 of GLI's proposal entitled "Delivery of Final Certification" states:

> As a result of the above-described tests, GLI will provide two formal reports explaining the results of the tests conducted. The reports will detail the types of games tested, the data that was collected, as well as the data that was provided and that was analyzed, the source code, the specific tests conducted and their results, an overall conclusion, and analysis graphs for each of the tests detailing the specific test

results for the game.

(Id. at 28).

TELC accepted GLI's proposal in late June 2007, and this became the contract between TELC and GLI.[2] Thereafter, on July 16, 2007, Smartplay delivered two automated draw systems and the source code for the Origin System to GLI for testing. In an accompanying letter addressed to Kanis, Thomas Markert ("Markert"), Smartplay's Executive Vice President, stated that the Origin System was being submitted "for certification on behalf of the Tennessee Education Lottery." (Kanis Depo. Ex. 42). That letter reiterated the specific games to be tested (including Cash 3 and Cash 4), and the parameters of the games, including which of the games were to be played with replacement numbers allowed.

On July 24, 2007, Grau wrote Renegar and stated that GLI "will test the Smartplay International Inc. Origin Systems and their corresponding games" and that "[e]valuation of the Cash 3, Cash 4, and Lotto 5 games is on tract to be completed by July 27th." (Renegar Depo. Ex, 17).

The Origin System as delivered had a Primary System Version 6.5.38 draw application which housed the operating system and graphics software. It also had a Random Number Generator Version 6.1 which housed the random number generator software.

Both the Cash 3 and Cash 4 lottery games have established parameters which provide that repeating or duplicate numbers can be drawn for each of the games. Thus, numbers like 112, 344

---

[2]On a TELC "Contract Routing Form," someone handwrote that GLI's proposal was "a sole source procurement necessitated by the need to get the RNG certified prior to the launch of the animated drawings." (Renegar Depo. Ex. 20). GLI insists that the notation was made by Renegar and, therefore, he, the Contract Manager, understood that only the RNG would be tested. Renegar denies the handwriting is his, but concedes that someone at TELC must have made the notation. For purposes of the pending motions, the Court must accept Renegar's testimony that the handwriting was not his. In any event, whose handwriting is on the document is a disputed material fact.

and 2525 can be drawn. However, in developing the Origin System, a Smartplay application programmer made a cut-and-paste error which provided that a "U" (for non-repeating number) be inserted where there should have been an "R" (for repeating number) in the game parameters for those lottery games.[3] This mistake allowed for repeat numbers to be drawn in the "test utility" mode, but not in the "live draw application" mode.[4]

GLI ran its numerous tests using the "test utility" mode and not the "live draw application" mode. As a consequence, GLI did not discover that the Origin System would not allow repeating numbers to be drawn in the live Cash 3 and Cash 4 drawings.

In an e-mail dated July 26, 2007, Robert Strahlendorf ("Strahlendorf"), another Senior Mathematician at GLI, wrote Renegar and informed him that GLI had finished the testing for the Cash 3, Cash 4 and Lotto 5 games, that "[t]he results of our statistical tests showed no significant deviation from expected behavior," and that "[n]othing was found in the design implementation that will affect the randomness of the RNG." (Renegar Depo. Ex. 26). Strahlendorf's e-mail was followed by a six page report dated August 3, 2007.

The report began by stating that "the intent of this report is to indicate that Gaming Laboratories International, Inc. has completed its evaluation of the Smartplay Origin System algorithm Version 6.7." (Strahlendorf Depo. Ex. 52 at 1). The report also stated that GLI had run

---

[3]The parameters for the Lotto 5 game did not allow for repeating numbers and, therefore, the programming error did not affect the Lotto 5 game. Neither the Lotto 5 game, nor the Raffle game is at issue in this litigation.

[4]The "test utility mode" allows operators to run and graph tests to determine whether the RNG is, in fact, providing random numbers, and/or whether there are any irregular patterns in the draw. It is a much quicker process because it bypasses the graphics which would appear in the "live draw application" mode.

30,000 draws on the Cash 3 game and 15,000 draws on the Cash 4 game, and that "[t]he Smartplay Program System RNG Version 6.7 data performed well on all statistical tests that were applied to it." (Id. at 2 & 6). The "Scope of Testing" section included the following:

> **Gaming Laboratories, International, Inc.** verified that all source code provided to our firm was free of extraneous routines which could adversely affect the randomness of the core algorithm. Additionally, we reviewed all design documentation to ensure that the overall game concept and design implementation will not adversely affect overall randomness.
>
>         \*              \*              \*
>
> <u>**Note:**</u> As part of the testing, we reviewed the Source Code that was used to create the software running in each of the Smartplay Origin Systems.

(Id. at 2, bold and underline in original). GLI concluded the report by writing, "our conclusion is that this Random Number Generator meets all of the necessary provisions for its intended use." (Id. at 6).

After testing, GLI shipped the equipment containing the Origin System to TELC. Allegedly in response to Stralendorf's July 26, 2007 email, TELC began utilizing the Origin System[5] for live automated drawings on July 28, 2007. The programming error went undetected from that roll-out day until August 20, 2008, with the result that persons who played the Cash 3 and Cash 4 games with repeating numbers had no chance of winning during that period. After the problem was discovered, TELC contacted Smartplay, and Smartplay corrected the programming error.

In a letter dated August 23, 2007, in response to an inquiry from TELC after the error was discovered, James Maida, President of GLI, did not suggest that GLI was only hired to test the RNG. Instead, he explained that the error was not found because the test was limited to the test application,

---

[5]On July 23, 2007, the Primary System Version 6.5.38 in the Origin System was replaced with version 6.5.46. From then, until October 8, 2007, there were another half-dozen updates to the Primary System. While TELC admits that there were updates to the system, both TELC and Smartplay claim those revisions were minor and did not affect the system's number-drawing functions.

not the live draw application. He concluded:

> GLI tests dozens of these systems each year. Our tests identify issues that must be corrected before the systems can be certified to standards set by Lotteries. This is the first time that such an error has been picked up in the field after our testing. As an ISO 17025 certified body, GLI will review our testing procedures and determine the additional measures that can be implemented to avoid future discrepancies. This review will include every facet of the testing process.
> At GLI, we are fully aware of the trust that the Tennessee Education Lottery places in us. We regret the events that unfolded over the past several days. Please be assured that we strive every day to provide the best, state-of-the-art testing services provided anywhere. Days such as today, while distressing, allow us to appreciate that we should never be satisfied with our testing processes and remind us why we are constantly developing more accurate and efficient testing methods.

(Docket 42-23, at 4).

Due to the programming error, TELC claims that it suffered close to $1.5 million in damages. This includes $762,507.00 paid to customers who could produce a lottery ticket that contained duplicate numbers purchased during the 23 day time frame when the programming error went undetected; $549,259.00 in increased prize payouts; and $95,000.00 for audit expenses.

On the issue of damages, Smartplay has filed a counterclaim in which it asserts it is entitled to the balance owed on the Origin System, which remains in use by TELC to this day. In this regard, Smartplay notes that on May 14, 2007, TELC paid a deposit of $110,650.00 on the $227,988.00 purchase price. Additionally, Smartplay accepted a Tennessee Lottery machine in trade and credited TELC $30,000 towards the purchase price. However, TELC requested the return of that machine and Smartplay returned the same on September 12, 2007. Thus, Smartplay contends that it is entitled to $149,714.00 from TELC.[6]

## II. STANDARD OF REVIEW

---

[6]That figure is derived from the following calculation: $227,988.00 (purchase price) – $110,650.00 (deposit) = $117,338.00 + $32,376.00 (return of TELC lottery machine, plus shipping and handling) = $149,714.00.

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the Court must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party. Meyers v. Columbia/HCA Healthcare Corp., 341 F.3d 461, 466 (6th Cir. 2003); Hopson v. DaimlerChrysler Corp., 306 F.3d 427, 432 (6th Cir. 2002).

### III. APPLICATION OF LAW

TELC asserts breach of contract, negligence and misrepresentation claims against both Defendants. GLI seeks summary judgment on all of TELC's claims, while Smartplay seeks summary judgment on its counterclaim for breach of contract/unjust enrichment.

#### A. GLI'S MOTION FOR SUMMARY JUDGMENT

GLI moves for summary judgment on TELC's breach of contract claim, arguing that it was not obligated to read the Primary System Code (where the error was contained), but was instead hired solely to test and certify the RNG. GLI asserts that this is borne out by both the unambiguous contract language and the course of conduct between it and TELC.

The rules underlying construction of a contract are well-known. The Tennessee Supreme Court reviewed the principles governing contract construction as follows:

> A cardinal rule of contract interpretation is to ascertain and give effect to the intent of the parties. Christenberry v. Tipton, 160 S.W.3d 487, 494 (Tenn. 2005). In interpreting contractual language, courts look to the plain meaning of the words in the document to ascertain the parties' intent. Planters Gin Co. v. Fed. Compress & Warehouse Co., 78 S.W.3d 885, 889-90 (Tenn. 2002). Th[e] Court's initial task . . . is to determine whether the language is ambiguous. Id. at 890. If the language is clear and unambiguous, the literal meaning controls the outcome of the dispute. Id. If, however, the words in a contract are susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language. Id.

9

> Contractual language "is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one." Farmers-Peoples Bank v. Clemmer, 519 S.W.2d 801, 805 (Tenn. 1975)[.]
>
> When contractual language is found to be ambiguous, the court must apply established rules of construction to determine the intent of the parties. Planters Gin Co., 78 S.W.3d at 890. An ambiguous provision in a contract generally will be construed against the party drafting it. Hanover Ins. Co. v. Haney, 221 Tenn. 148, 425 S.W.2d 590, 592 (1968); Vargo v. Lincoln Brass Works, Inc., 115 S.W.3d 487, 492 (Tenn. Ct. App. 2003). Furthermore, when a contractual provision is ambiguous, a court is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract. See, Memphis Housing Auth. v. Thompson, 38 S.W.3d 504, 512 (Tenn. 2001).

Allstate Ins. Co. v. Watson, 195 S.W.3d 609, 611-12 (Tenn. 2006).

Applying these rules to the facts of this case, the Court finds that the contract, when read as a whole, is ambiguous since it can be read as requiring that GLI do more than test the efficacy of the RNG to produce random numbers. GLI points out that the contract is titled "Response to the Tennessee Education Lottery Corporation Request for Random Number Generator Testing and Certification," and that on page 1 the contract states that TELC "requested information on testing and certification of the Random Number Generator (RNG) provided by Smartplay[.]" (Docket No. 35-5 Ex. 20 at 1). However, that request for certification was made in the context of the lottery games at issue – Cash 3 and Cash 4 – and GLI, as evidenced by its proposal in response to the request, recognized that those games required that repeat numbers be drawn when the system went live.

Further, specific language in the contract indicates that the parties may have intended GLI do more than simply certify the RNG. In Section 3, which was titled "Proposed Solutions" and which was directed specifically at the Tennessee Lottery, GLI indicated that one of the purposes of testing was to ensure that "the draw device is capable of generating numbers or rules that are

10

appropriate for each of the defined games." (Id. at 26). GLI also indicated that it would "analyze all code it is given for theoretical randomness," that it would "review all design documentation to ensure that the overall game concept and design implementation will not adversely affect overall randomness," and that it would "verify that the software is capable of producing all numbers within the desired range and that all numbers are evenly weighed." (Id. at 25-26). Additionally, after indicating that "[t]he key concern with traditional lotteries is the testing of a Random Number Generator," GLI stated its testing would include "[v]erification that there is no internal code that can affect the overall randomness of the application," and that such verification "is just as important" as insuring that the initial numbers selected are random. (Id. at 25).

The circumstances and the dealing of the parties also suggests that the intent may have been more than that GLI merely test the RNG. This is particularly so when the facts are construed in TELC's favor, as they must be on summary judgment.

TELC was embarking on a new venture – a change from a mechanical ball to an automated drawing – and lottery officials wanted the system tested in such a way that would ensure the fundamental fairness of the actual live drawings. Indeed, in their depositions in this case, both the Contract Manager, Renegar, and Rebecca Hargrove, President and Chief Executive Officer of TELC, testified that the very reason GLI was hired was to certify that the games would be valid and would play the way they were supposed to be played. (Hargrove Depo. at 58; Renegar Depo. at 58).

A suggestion that this might have been GLI's understanding of its role from the inception can be seen in the initial email from Kanis to his superior and colleagues at GLI that TELC wanted them "to test the updated Origin System from Smartplay for a Cash 3, Cash 4, Lotto 5 and Raffle game." (Kanis Depo. Ex. 43). In that email, Kanis stated that he explained to Renegar how GLI

11

"test[ed] for randomness and correlation between FINAL game outcomes," that GLI (unlike its competitors) goes farther than merely doing "a raw number or algorithm test," and that GLI was used by most state lotteries because "we keep in mind the best interest of the lotteries in that we make sure that the player is getting (and they see) a random final outcome that is no way correlated to other outcomes." Similarly, in his May 21, 2007 letter to Renegar, Kanis wrote that GLI's testing of the RNG would include "[c]heck[ing] for any back doors or logic errors." (Renegar Depo. Ex. 19).[7]    Post-contract communications likewise can be read as suggesting that GLI was to test the entire system, and not just the RNG. When the system was delivered to GLI by Smartplay, Markert wrote that the system was being submitted "for certification on behalf of the Tennessee Education Lottery," and reiterated the parameters of the games, including that the Cash 3 and Cash 4 games were to allow repeat numbers. (Kanis Depo., Ex. 42). Upon receipt of the system, Grau informed Renegar that GLI would test the "origin Systems and their corresponding games" by July 27, 2007. (Renegar Depo. Ex. 17).

Both the preliminary results and the final report can arguably be viewed as stating that GLI was required by contract to do more than test the RNG, and did so. In his July 26, 2007 email to Renegar (on which TELC allegedly relied to go live with the automated drawings), Strahlendorf wrote that "statistical tests showed no significant deviation from expected behavior," and nothing was found in the design that would affect the randomness of the RNG. (Renegar Depo. 26). The follow-up report contained a "Scope of Testing" section that stated GLI had verified all "source code[s]" were "free from extraneous routines," and that GLI "reviewed all design documentation

---

[7]The Court is aware that those documents are ambiguous and can be read differently. For example, the email has as its subject line "additional RNG testing" and states the TELC seems to be "experimenting until they find the RNG that they like." However, the point remains that all facts, and the inferences to be drawn therefrom, must be construed in TELC's favor at this juncture.

to ensure that the overall game concept and design implementation will not adversely affect overall randomness." (Strahlendorf Depo. Ex. 52).

Even after the error was detected, GLI did not initially protest that it was not responsible, or that its testing and certification was limited to the RNG and its ability to draw random numbers. Instead, GLI's President wrote TELC and explained how the error went undetected, how it was the first time such a thing had happened, that GLI "regretted" the event, and that GLI would review "every facet of the testing process" in an effort to "determine the additional measures that can be implemented to avoid future discrepancies." (Docket 42-23, at 4).[8]

"The overriding issue in contract interpretations is directed at determining the intention of the contracting parties." Mercer v. Hadley, 2007 WL 1774205 at *5 (Tenn. Ct. App. 2007). Here, whether GLI was supposed to test just the RNG, or instead insure the overall soundness of the Origin System in relation to the Cash 3 and Cash 4 games cannot be gleaned by merely looking at the ambiguous contract. Further, the parties' actions and conduct do not definitively answer the question and there are numerous facts in dispute about the intentions of the parties. Therefore, GLI is not entitled to summary judgment on TELC's breach of contract claim.

GLI also moves for summary judgment on TELC's negligence and misrepresentation claims, arguing that the parties' relationship was governed by the contract and GLI did not owe TELC any duty or legal obligations outside the scope of that contract. In response to those arguments, TELC

---

[8]The Court recognizes GLI's assertion that updates were installed by Smartplay to the primary system after it arrived at TELC. However, GLI has not shown that those changes affected how the numbers were drawn. According to Markert of Smartplay, one of the updates was made "to improve the reliability of the modem drivers," and "had absolutely nothing to do with the game generation or the request for numbers to the RNS," while other updates were "minor," none of which had anything to do with the way the numbers themselves were drawn. (Markert Depo. at 139-143). In any event, there are questions of fact preventing summary judgment as to whether any of the updates impacted the system's ability to draw winning numbers, and/or affected the games.

concedes that it "pled its negligence cause of action as an alternative theory of liability" and that "[t]o the extent Plaintiff is allowed to proceed on its contract claim against GLI and to the extent GLI's duties to perform are based upon the parties' agreement, TEL[C] does not seek to also claim a separate independent cause of action for negligence." (Docket No. 40 at 23).

"Ordinarily, it is not a tort for one of the contracting parties to breach the contract" because duties in a contract are "party specific" and "[a]ny breach of them, whether wilful or careless, is a breach of duties that the parties have fixed for themselves." Thomas and Assoc., Inc. v. Metro Govt., 2003 WL 21302974 at *6 (Tenn. Ct. App. 2003). Thus, "if the only source of a duty between a particular plaintiff and defendant is their contract with each other, then a breach of that duty, without more, ordinarily will not support a negligence action." Id.

Here, TELC has a viable claim for breach of contract that will be adjudicated at trial. Given TELC's concession that its negligence claim was merely interposed as an alternative, and given that TELC advances no breach of a duty apart from the contract so as to support an essential element of negligence, GLI is granted summary judgment on TELC's negligence claim.

However, TELC also asserts a claim for misrepresentation. The theory here is that, even apart from the contract, GLI represented that it would test the entire system, and any claim to the contrary means that GLI committed fraud in the form of a misrepresentation.

While a plaintiff may not recover twice for the same damages, "'[t]here is no inconsistency between different remedies all of which are based upon the affirmance or disaffirmance of the contract.'" Allied Sound, Inc. v. Neely, 909 S.W.2d 815, 822 (Tenn. App. 1995)(quoting, McQuiddy Printing Co. v. Hirsig, 134 S.W.2d 197, 203 (Tenn. 1939)). Alternate theories of recovery are barred only where the remedies sought are "truly repugnant to one another," but a claim for

14

misrepresentation is not repugnant to a claim for breach of contract, nor are the "theories of breach of contract and fraud . . . 'repugnant or antagonistic to each other.'" Id. (citation omitted). The Court also finds there are material facts in dispute on whether GLI misrepresented that it would test the entire system. Thus, summary judgment is denied on TELC's misrepresentation claim.

**B. SMARTPLAY'S MOTION FOR SUMMARY JUDGMENT ON ITS COUNTERCLAIM**

Smartplay moves for summary judgment on its counterclaim in which it alleges that it is entitled to $149,714.00 from TELC, consisting of the $117,338.00 balance on the sale of the Origin System, plus $32,376.00 for the return of the original lottery machinery which had been taken in trade. In response, TELC does not dispute that Smartplay is entitled to recover monies but, in fact, admits it "owes Smartplay an additional amount for the purchase of the systems." (Docket No. 43 at 3).

TELC argues that it withheld paying the remainder due because Smartplay breached the parties' agreement and, consequently, Smartplay is liable to TELC for the breach. As such, TELC argues that a genuine issue of fact exists involving whether "Smartplay itself has breached the parties' agreement and is liable to TEL[C] for more money than it seeks to collect from TEL[C]." (Id. at 4). TELC goes on to argue that because it may prevail on its claims and its damages would be more than that to which Smartplay is entitled, TELC is "entitled to offset any amounts that it may owe Smartplay . . . under the doctrines of set-off and recoupment." (Id. at 3).

"'The fundamental philosophy of all setoffs and recoupments is that a party being sued for money may claim entitlement to money from the party bringing the suit, permitting the adjudication of countervailing claims in one suit.'" Bakir v. Massengale, 2010 WL 3394037 at *2 (Tenn. Ct. App. 2010)(citation omitted). While claims for set-off and recoupments envision resolution in the

15

same suit, this does not mean that claims which may be offset must be resolved at trial, as opposed to summarily adjudicated on an undisputed record. Rather, a "Court may grant summary judgment in favor of a moving party, even if there is a possibility of set-off brought about by claims remaining as an issue for litigation." Marathon Ashland Petro., LLC v. Selker Bros., Inc., 2007 WL 1169322 at *3 (N.D. Ohio 2007); see also, Tycoons Worldwide Group v. JBL Supply, Inc., 2010 WL 2465476 at *7 (S.D.N.Y. 2010)("the fact that [defendant] may have a counterclaim against plaintiff does not preclude the entry of summary judgment against [defendant] for the undisputed amount it owes plaintiff"); Electro-Catheter Corp. v. Surgical Specialties Instrument Co., 587 F.Supp. 1446, 1456-57 (D.N.J.1984) (summary judgment on a claim for sale of goods warranted where defendant did not dispute that goods were delivered or that invoices accurately reflected the price of the goods, even though defendant's claim for setoff remained to be adjudicated).

In this case, there is no dispute that the parties agreed upon a purchase price for the Origin System. There is also no dispute that the Origin System was delivered and accepted by TELC. Finally, there is no dispute that TELC continues to use the Origin System, but has not paid Smartplay the entirety of the agreed-upon purchase price. As such, Smartplay is entitled to summary judgment for the remaining balance owed, the amount of which will be determined at trial

Although the Court finds that Smartplay is entitled to summary judgment on the issue of liability (but not the amount of damages), the Court will not direct the entry of a final judgment in favor of Smartplay on its counterclaim until after trial This is because the amount due Smartplay is yet to be determined, and that amount may be subject to offsetting or recoupment by the amount TELC may recover if it ultimately prevails on its claims against Smartplay. See, Marathon Ashland, 2007 WL 1169322 at *3 ("Court may grant summary judgment on Plaintiff's claim while reserving

16

ruling on damages until after the resolution of Defendant's counter-claim"); <u>TVI, Inc. v. Infosoft Technologies, Inc.</u>, 2007 WL 3565208 at *6 (E.D. Mo. 2007)(noting that "[f]ederal courts routinely hold that the existence of a set-off counterclaim does not prevent entry of summary judgment on a breach of contract claim" and holding that while summary judgment would be granted on breach of contract claim, amount of damages would be determined at trial because there could be a set-off).

## IV. CONCLUSION

On the basis of the foregoing, GLI's "Motion for Summary Judgment" (Docket No. 32) is granted with respect to TELC's negligence claim, but denied with respect to TELC's breach of contract and misrepresentation claims. Smartplay's "Motion for Summary Judgment on Its Counterclaim" (Docket No. 37) is granted as to liability, but not damages, and the Court will not enter a final judgment on the Counterclaim pending resolution at trial of the amount of Smartplay's damages and TELC's claim for the recoupment or set-off of damages against Smartplay.

_____
Todd J. Campbell
United States District Judge